Today we have four cases on oral argument, and two which have been submitted on the record. For the purposes of the transcript and the recording, I will list the submitted cases, which are 05-5040 Gerrit Consulting v. U.S. and 05-3310 White v. United States Postal Service. The first case on oral argument is 05-5072 NTL Australia Bank v. U.S. Mr. Austin, you are reserved five minutes for rebuttal. Are you ready? Let's get started. Thank you, Your Honor. May it please the Court. The trial court erred in awarding... Before you begin on that, what's the government's position now on the liability issue with respect to the Guarini Amendment? I notice that you've given up on that in this case. Have you given up on it as far as in-bank and court review is concerned, too? We have not, Your Honor. As we indicated in the letter that we submitted to the Court, for purposes of this case, we are admitting that those cases are controlling, but we're reserving our rights for further review. With respect to the precedent in the case of the Centex case, that is a final decision. First Heights is a final decision. First Nationwide, time has expired for seeking a bond review, however, the time has not expired with respect to seeking a service review. Just in that one case? In that one case, that's correct. This case, of course, is today. Tomorrow will be another one of the Guarini cases argued, in which case we are contesting liability. Again, I would emphasize, we are contesting liability in this case, but only with respect to reserving our rights for further review. We recognize that the precedent that now exists is controlling. How many more cases are pending that involve this litigation? There's only, other than the case being argued today and the case tomorrow, there's only one other case that's pending before the Court of Federal Claims this time. The one that was fixed altogether? That's correct. There was one other case that was settled, and it was one other case in which the government prevailed at the Court of Federal Claims level. In that case, it was not appealed by the acquirers. Thank you. The trial court erred in awarding damages because National Australian Bank, which I will refer to as NAB, failed to prove its damages with reasonable certainty. Even if the court concludes that NAB did prove damages with reasonable certainty, the proper award of damages should be $17 million rather than $27 million to reflect that the FDIC, the Federal Deposit Insurance Corporation, was entitled to tax benefit sharing at a rate of 50% rather than 25% as found by the trial court. What's the language in the termination agreement? Put aside questions of reformation. What language in the termination agreement supports 50-50 sharing? Well, Your Honor, the error of the trial court is its interpretation of Section 8. No, no, no. What language in the termination agreement do you say requires 50-50 sharing? We can't point, as we indicated in our Court of Federal Claims, to a specific provision which mandates 50-50 sharing. Our argument is that when you look at all the circumstances and the unrebutted evidence that it was the party's intent to change the deal. I can't deal with that. I thought your answer—I would think your answer to Judge Dyke's question would be the language that says that it would accrue to the benefit of the FDIC manager under this agreement. Well, that's what I'm referring to. That's what I'm referring to in Section 8.4. That's correct. So that provision, in your view, in response to Judge Dyke's comment, is what mandates, what requires, or at least what gets us to the 50-50 split. That is exactly correct, Your Honor, because the trial court was correct in saying that— I don't understand that. How does that language get you to a 50-50 split? It gets you to 50-50 because, again, the trial court read a period after referring back to the assistance agreement, and the trial court was correct and did refer back to the assistance agreement, but what the trial court ignored was the fact that there's a war clause there, and it says, as referred to— I don't understand. How does that get you to 50-50? It gets you there because this Court's rules in construing contracts, contract interpretation, is that no language there is superfluous. They had to have meant something by that war clause. But it still doesn't give you any language in the termination agreement that provides for a 50-50 split. The only language in the termination agreement is that there's a 50-50 split for all tax benefits after the year 1944. But it doesn't contain that language. It doesn't say that. Well, it does say 50-50 splitting for years— For some purposes, but not for this purpose. But it makes no sense to have that language there. If there was a period, if you simply said, we're going to incorporate the language in the assistance agreement, this would be a different case. But what this Section 8.4 says, war as provided in this termination agreement, you have to assume that that was there for some purpose. It would make absolutely no sense to have that language in the assistance agreement. Remember, Section 8.4 only dealt with covered asset losses. It's the only subject of it. So you have to interpret, as the trial court did, that they said war as provided in this termination agreement and then meant that there was no provision in this termination agreement that applied to covered assets. That makes no sense. It's kind of like an argument for reformation rather than for interpretation because you're not giving us any language that can be interpreted. I mean, you may have an argument for reformation, both of the assistance agreement and of the termination agreement, but I just am not seeing any language in either one of those agreements that can be said to be ambiguous, much less language that supports your result. Well, I would certainly agree with the Court that it supports reformation, but I would disagree with the Court that it also cannot be for the purpose of construing that particular clause. Could the language have been written clear? Absolutely. There's no question. What language are we construing? We're construing the language that says that as provided in this termination agreement. And you have to look at the whole context of what was occurring here, which is what this Court has said in the Jack Reed case and the Firestone Tire case. It's undisputed in this case that in the original assistance agreement, there was a flaw in the tax benefit sharing provisions. It was Section 1KK, and it was written in a manner such that tax benefit sharing would always remain at 25%. But is the flaw that was there in the original agreement that there was double counting of the invested capital, previously invested capital? That's the flaw, right? That's the flaw that led to the conclusion of everybody that it was literally impossible for there ever to be 50% sharing, which was contrary to the intended purpose. Okay. And you are arguing that the Court of Federal Claims deferred in not granting reformation on that basis? We're arguing that after the termination agreement, there should be reformation, basically for the termination agreement language to the extent it didn't include— But not of the—you're not— And also of the underlying assistance agreement. Our position was that had we thought that this problem was not resolved in the termination agreement, which NAB themselves thought was resolved, as indicated in their tax documents and their listing of their impression of what the termination agreement held, had we thought that it was not resolved in the termination agreement, then we would have sued for reformation. But we didn't think it was an issue because they agreed that from 1994 forward, all tax benefits were to be shared at 50%. And you also have to— Nobody from the government bothered to read the actual language of the agreement? Well, I think you have to look at the circumstances. And what happened was— They were too busy to read the agreement? There were a number of circumstances which led to what could have been a termination agreement that was written better. The first one was that there were no remaining covered asset loss deductions to be shared. And that was because they were settled. Okay? As they're going through the termination agreement, there's a large payment that goes to NAB. And the only reason—remember, before Berrini, you were entitled to a covered asset loss deduction. And because you were entitled to that and you couldn't use it, it would become what we call a net operating loss or an NOL. There were certain NOLs that were on the books that would be shared because the benefit, the tax benefit, would be realized in the year 1994 or after. But they were all settled. Were they all settled in 1994 so they all became NOLs? They all became net operating loss carry-forwards? Well, they were net operating loss carry-forwards before, at the time they were negotiating the termination agreement, so that they would have been part of Section 2.5. But what happened was the government and NAB got together and they said, okay, we're going to project that NAB will be entitled to use these covered asset loss NOLs in the future, and we're going to discount them appropriately, and they arrived at a lump sum figure. That lump sum figure is incorporated into the termination agreement into Section 2.188. And therefore, there were no covered asset loss deductions to share. And of course, for future covered asset loss deductions, there were none because of the Grini legislation. So it was inadvertent that it was not included, but it wasn't included because there was nothing to share. And what the parties tried to do through the termination agreement because, again, and I think this is a very important point, they had to refer back to the assistance agreement. They had to refer back to the section of the assistance agreement that was flawed for sharing because they did keep that alive, but only for purposes of tax benefit sharing up until 1993. Because if they didn't do that, there was no provision that applied to tax benefits. You're suggesting we don't go back to the original agreement for the tax sharing provisions under these circumstances? Well, the termination agreement— And if you do, then what difference would it make if the original agreement were reformed? I'm not sure I follow your understanding. Well, I'm not sure I'm understanding you, but I thought you were saying that the assistance agreement had a flaw in it. It did. That you're asking for reformation to correct the flaw. That's correct. But at the same time, you're arguing that the tax sharing provisions of the original agreement have nothing to do with tax sharing under the termination agreement. I don't think I am arguing that. Okay. What I was saying is section 8.4 was forced to incorporate the flawed section in part because it had to deal with tax benefits that would be realized in the years 1989 to 1993. The termination agreement only dealt with a 50 percent tax benefit sharing for tax benefits realized in the years 1994 and beyond. So that is why there's that cross-reference that's causing all this confusion. Because it wasn't part of the deal that tax benefit sharing would go up to 50 percent for tax benefits realized from 1989 to 1993. And this is made very clear in the Meyer memory. And he explains very clearly why this is the case. He says in that provision that even if section 100K had been drafted appropriately, it wouldn't have made any difference up until 1994. The judge also, in a footnote, the judge also, referring to reformation, says that even if there were a reformation issue here, it's covered by laches. That's right. And the government, as far as I read, your blue brief and your gray brief never says anything with regard to that. We don't address the laches argument because we disagree. First of all, we think there should be reformation of the termination agreement as well as the assistance agreement. And the laches really doesn't apply because they thought it was fixed. They didn't realize it wasn't fixed really up until the time the trial court's decision came out. So there couldn't be any laches. He argued, the judge argued, laches on the basis that they incorporated the error, but they didn't incorporate the error. Well, if you reform the assistance agreement, then there's no need to reform the termination agreement, correct? That's correct. And the question is, was there prejudice? To the government? No, no, to the bank. To the bank. The bank. There's no prejudice to the bank. Laches doesn't apply unless there's prejudice to the bank. Well, there's no prejudice to the bank at all because Why didn't you argue that? Well, I think, well, we are arguing that there's no prejudice to the bank. I mean, they were under the impression, if you look at their tax documents, if you look at the underfunded deposition testimony, that there was 50-50 sharing. Nobody realized that there was a problem until this litigation. How does section 2.5 of the judgment come into play then? Section 2.5 addresses it because it deals with a different type of tax benefit, but it's where the covered asset loss provision would have been had there been any covered asset losses to share, any covered asset loss deductions to share. And it's also in the affidavit, the declaration of Mr. Veal, where he says that had this not been settled, it would have been part of section 2.5. It's the mechanism by which any section 1KK 50-50 sharing to replace it was in section 2.5. And I'm already in my time, so unless there's any further questions. Thank you. We've got some questions, so we'll restore about three minutes of your rebuttal time. Thank you. Mr. Scarborough. Good morning, and may it please the Court. My name is Ryan Scarborough, and I represent NAB, National Australia Bank. I'd like to start by addressing the Court's question with regard to reformation because reformation requires a mutual mistake. The parties here set out two specific provisions within the termination agreement at which we would have to share covered asset loss deductions at 50% if there was an increase in the amount of covered asset loss deductions. That's set out at section 2.6F6, and that would be if the IRS, the Congress, or the FDIC were to do something that would increase the amount of covered asset loss deductions. In that situation, there's no dispute that we would have to share 50%. But there's nothing inadvertent about the fact that covered asset loss deductions recovered by NAB through litigation where the government doesn't yield it. That's just an argument that the agreement as drafted doesn't do what the government wanted to do. That's not an argument against reformation. The government's argument is that the assistance agreement and the termination agreement were drafted so that they did not reflect the party's intent, that there was a mutual mistake. And it's not an answer to say that there was a mistake. That's what gives rise to the reformation claim. I understand, Your Honor. My point would be we've conceded that there was a mistake with the assistance agreement. That's why the parties entered into the termination agreement. They didn't enter into the termination agreement unaware. So you agree that there was a mutual mistake with respect to the assistance agreement? We have agreed that under the definition of the assistance agreement, it would never get under any practical application. It would never move from 25% sharing to 50% sharing. And you agree that there was a mistake in double counting the invested capital? Yes, that was not the party's original intent under the assistance agreement. The parties, however, did enter into a termination agreement, and at the time they entered into the termination agreement, they recognized the flaw in the assistance agreement. And they went into the termination agreement, and they set out many different sharing percentages that apply in many different circumstances. But you argue, as I understand it, that the termination agreement doesn't cover this circumstance. It doesn't say anything about 50-50 sharing or the percentage of sharing in these circumstances. And for that purpose, you need to go back to the original assistance agreement, correct? That's correct. So why isn't reformation an available remedy to correct the original assistance agreement if the parties intended that to continue to govern? Because at the time they entered into the termination agreement, they specifically set out in Section 8.4, first you look to the termination agreement. If the sharing percentage is not there, you look to the assistance agreement. That decision to incorporate the express sharing percentage of the assistance agreement trumps the fact that there was an underlying mistake with the original assistance agreement. Why? Because the parties recognized it at the time that there was a mistake with regard to the 25% versus 50% sharing. When they entered into the termination agreement, that was done with that knowledge. They weren't unaware of the mistake in the assistance agreement at that time. But what's the indication that they didn't want to correct the mistake? The indication is they went in and entered into a termination agreement that includes a lot of different sharing percentages that apply. The reason why you go in and delineate two specific circumstances for 50% sharing for an increase in covered asset loss deduction is because, by definition, if you're laying out those two specific circumstances, there has to be a reason why you haven't put in the third circumstance, or the fourth, or the fifth. So your theory is they made a mistake. We all know it was a mistake in the first instance, but the government has one crack at fixing the mistake. And because they didn't take advantage of that one opportunity to fix the mistake, then they stuck with it? No, that's not quite right, Your Honor. With regard to the termination agreement, they recognized it at the time. They went in and they entered into an agreement to address the issue. The termination agreement wasn't just simply to fix the underlying assistance agreement sharing percentage. It was meant to do a lot of different things, to terminate the entire assistance agreement in effect, except for Section 8.4, which, for purposes of litigation, means you incorporate the 25% sharing rate that's set out in the assistance agreement. That's the one time that the assistance agreement is expressly referred to and incorporated into the termination agreement. The entire agreement is incorporated, or we're just talking about 8.4? We're just talking about Section 8.4, because the termination agreement, by its terms, was meant to terminate, except for the fact that it expressly incorporated as a catch-all the 25% sharing rate if there was not a sharing rate set out in the termination agreement that governed this circumstance. And the government has conceded that there's no sharing percentage in the termination agreement that requires 50% sharing here. They've conceded that, and they're left with speculating and offering all sorts of affidavits and plural evidence about what the government negotiators wish they'd done They're presenting evidence that both parties intended to recognize that there was a mistake. That's a mutual mistake. I mean, you can assume, for purposes of reformation, that there was a mistake and that it wasn't corrected. The question is, why does the termination agreement bar the correction of a mistake that everybody seems to agree existed in the assistance agreement? Your Honor, I disagree with the premise of your question to the extent that it assumes that there's a mistake in the termination agreement. No, no. Assistance agreement. With regard to the assistance agreement. Everybody agrees there's a mistake. Everybody agrees. We are not contending that the parties, under the original assistance agreement, didn't mean for the sharing rate to switch from 25% to 50% at some point in time. The way the calculation was drawn out. You said that the parties didn't intend to have the investment capital double counted. That's correct. There's no dispute about that. Okay, so why does the termination agreement, what language in the termination agreement bars the correction of that mistake in the assistance agreement? There's no expressed language in the termination agreement that specifically says you can't go back and correct the assistance agreement sharing. The language that I refer to is the entire provision of Section 8.4. Because Section 8.4, to have meaning, that reference to the underlying sharing rate in the assistance agreement has to mean something. It can't just be the government saying it was supposed to be 50% and the assistance agreement and the reference to that is meaningless. Section 8.4 has meaning. Where's the language you're talking about? In Section 8.4? No, I mean what page? It's located at page A20463. 20463. And it moves on to the second page, 20464. Okay, so what's the language? It initially has sort of a prefatory statement. And then at the bottom of page 63, moving on to page 64, it talks about the amount of damages or refunds sought in such claims, and that's referring to the Guarini legislation claims, shall not include the amount that would accrue to the benefit of the FDIC manager under the assistance agreement or that would accrue to the benefit of the FDIC manager under this agreement. The reason why there's a reference to the assistance agreement, that has to mean something. And they refer back to the 25% sharing of the assistance agreement. It has to mean something, but why does it preclude reformation of the assistance agreement? Your Honor, the response I would have to that point is simply the fact that the parties delineated specific circumstances in which there would be 50% sharing for an increase in covered asset loss deductions is an indication that there was no mutual mistake as to the intent here. The parties didn't set out an across-the-board 50% sharing rate. They entered into various sharing rates that apply in different circumstances. There's a 100% sharing rate, 50%, 43%. So you're saying that because of that language, then their reference to the assistance agreement means that they were incorporating what they both recognized was a mistake in provision. That's correct. They would not have referred back to the assistance agreement in that situation if the whole reason they did that was with the knowledge that there was still a mistake, but the reason why they went back and referred to it was because it was the 25% sharing. And it's in a situation like this where the government doesn't yield any quarter, doesn't concede that they made a mistake, they breached the contract, and NAB has to go forward and litigate to the very end to obtain a damages award. In that situation where NAB has put itself out at risk, it is entitled under the termination agreement to keep 75%. That's what Section 8.4 does. If the government had reconsidered its position either before litigation began or during litigation and acknowledged that they had breached the contract and offered us the compensation for the covered asset loss deductions, in that situation, Section 2.6 F6 of the termination agreement would require us to share those tax benefits at 50%. We don't dispute that, but that's not this situation, and that's why Judge Brugging, the trial judge below, recognized that in this case the plain language of the termination agreement says if you don't find the sharing percentage laid out in the termination agreement and the government conceded that that sharing percentage is not found in here, there's no provision that applies specifically to this case, then you look through Section 8.4 to the assistance agreement. So why is that language there at all? That final phrase, I mean, as the government argues in its brief, you're interpreting this provision on page 464 as if that phrase doesn't exist. You're saying there's no provision in the termination agreement that governs here. Well, then how do you explain the party's specific reference? That actually is not our position. That last phrase with the reference to the termination agreement does have meaning, and it's meant to capture the situation where we initiate litigation, the government or Congress or the FDIC or IRS recognizes the mistake and returns the lost tax deductions that we were deprived of due to the government's breach. If they return that to us without us having to litigate to the end, then we would have to share it at 50%. But where they haven't given up anything, haven't made a single concession until today with regard to not pushing the liability issues, in that situation where we've had to go to the mat to get the lost deductions, under Section 8.4 we get to keep 75%. Even though that's a continuation of the same mistake that was in the assistance agreement? Yes, Your Honor, I would contend that at that point it's no longer a mistake because the parties have knowingly adopted the language from the assistance agreement with the knowledge that the underlying calculation would only require 25%. By affirming that and accepting that, there's no longer a mistake that's being perpetuated. Where's the knowledge of that? I'm sorry? Where's the knowledge of that if in fact it was a mutual mistake by the party? Well, excuse me, but I believe that the government has even come forward and stated that the entire reason for entering into the termination agreement was because they recognized that there was a flaw with the underlying sharing percentage in the assistance agreement, in that calculation. So they went into the termination agreement with the eyes open. So where's the evidence? Did you have any evidence, any parole evidence, to assume that this is ambiguous as to whether the assistance agreement could be reformed, that the parties intended to preclude reformation of the assistance agreement to correct it? Do we have any parole evidence with regard to that? Yes, is there any testimony? No, Your Honor, well, the testimony that's in the record right now relates to the fact that the termination agreement, they entered into many different sharing percentages that would apply in different circumstances. Mr. Orians, one of the tax personnel who was involved in the termination agreement, testified that they entered into a mishmash, was his exact words, of different sharing percentages to apply in various situations. There is no parole evidence that we've offered on this point simply because the termination agreement itself is unambiguous, and within the four corners, it provides for 75% of the tax benefits to stay with NAB in this particular case. By incorporating the original assistance agreement. Yes, and my only point with that, Your Honor, is that they didn't incorporate it blindly. They didn't incorporate it without knowing that there had been an underlying error originally. They recognized that. They recognized that the sharing would never move to 50% under that circumstance, and yet they went and incorporated it anyway. They did it with their eyes open, and that's because they recognized that in this kind of a situation, we would be entitled to keep 75%, not just 50%. Were all of the covered asset losses realized by 1994? Were they all realized before 1984? 1994. In terms of whether they were taking on their tax returns, or just whether they had been paid by the FDIC? Right. They were paid by the FDIC prior to 1994. In fact, they were paid in the balance of 1991, and they were finished by 1993. So by 1994, all of the asset carry-forward losses were determined at that point. That's correct. I recognize that I'm running out of time. One point I would like to make before moving on. Counsel for the government referred to the fact that Section 2.5 in the termination agreement governed NOLs, and that would apply in this situation, which is where covered asset loss deductions would appear. The response I would like to make is Section 2.5 deals with surly NOLs, which is different than just an ordinary NOL. A surly NOL relates back, and by the definition of Section 2.5, is the NOLs that existed in the thrift prior to the date of acquisition. So other losses that arose afterwards, that might be NOLs that would come up afterwards, do not fit within the definition of Section 2.5 because they're not surly NOLs. I recognize that I'm running over my time at this point. Thank you. Thank you. Mr. Austin, you have three minutes. Thank you, Your Honor. I'd like to start by responding to your question, Judge Geharst, about the realization of the covered assets. There are two different things that you have to keep in mind. One is that the asset may be, depending on what definition you use of the word, realized at the time of the disposition of a covered asset. So there is a covered asset loss when the asset is disposed of in 1994. The key question for purposes of tax benefit sharing is not when the transaction occurs or when the loss is incurred, but when the tax benefit is realized, so that you would get an NOL. So it might not be until 1998, for example, that NAB might have sufficient income in order to utilize the tax losses that they had with the deductions. So that would be under both the terms of the assistance agreement and the termination agreement, a 1998 tax benefit. And therefore, it was the intent of the termination agreement to say for the years 1994 and beyond, there's going to be 50-50 sharing. But as the express language of Section 8.4 talks about in reserving NAB's right to pursue this litigation, it talks about that it could affect tax benefits for the years 1989 and forward. Well, there was no disagreement between the parties that for the years 1989 through 1993, they were entitled to 25% tax benefit sharing. They didn't have to share those for 50%. So that if, as a result of their litigation, they were entitled to amend their 1991 returns because they had additional 1991 tax benefits, well, they were entitled to a sharing of that at 25%. And that's the only reason, awkwardly as it may be, that's the only reason the assistance agreement is incorporated back, that flawed provision is referred back to in Section 8.4 because for those years, they wanted to establish that NMV didn't have to share 50-50. They only had to share it 75-25. So that's why. And the question here when you look at the extrinsic evidence, it's unrebutted. Everybody, NAB and the government, fought after they negotiated the termination agreement that they had fixed this mutually agreed upon flaw. They thought it was fixed and that everything was set. So is it the government's position that therefore when they refer to the assistance agreement it was for the pre-'94 at the 25% and the post-'94 at the 50%, that 50% being reflected in the fixed provision of the assistance agreement or in the termination agreement? The termination agreement. Because we still, assuming we can't find anything in the termination agreement that deals with the 50%, assuming we disagree with you there, then what are we left with for that 50% unless it's the theory that you were referring to the reformed assistance agreement? Well, what you're left with is an ambiguous provision. You have to say to yourself, why in the world would they have included that language? And then you look at the extrinsic evidence, and the extrinsic evidence is unrebutted. It's unrebutted that both parties intended and that both parties thought they had accomplished 50% sharing for the years 1994 and beyond. Well, that seems to support the bank's argument that even the reformation of the assistance agreement wouldn't accomplish anything. If everyone was so clear that the assistance agreement only had this one little purpose, then reforming it to correct the mistake wouldn't do you any good. Well, it would do us good because for the years 1994 and beyond we would be entitled to 50-50 sharing. There's no basis whatsoever that anybody thought... In fact, Section 8.4 was only for the purposes of litigation. Everybody thought, after they accomplished the termination agreement, that if they pursued this litigation and they were successful, what would happen is you determine what their tax losses were and then you would do 50-50 sharing. That's what they put in their tax returns, that's what they gave their experts, that's how they evaluated it, and therefore their whole purpose here is to exploit what is essentially, if you agree with their argument, a drafting error. I mean, nobody intended this result. It would be totally contrary to the intent of the parties to agree with them, and what we're saying is that if you look at Section 8.4, you can see the termination agreement, if you accept their interpretation, did not accomplish the intent of the parties. What should have happened here is when they redrafted the provision, it should have said 50% for the years 1994 and beyond and 25% for the early years. That's what they intended to do. Where do I find testimony of that effect? Well, there is evidence in the record. Where do I find testimony that they intended that from 1994 and beyond that there would be 50-50 sharing? Oh, that's in the declarations that we submitted, the declarations of Mr. Vitola and the declarations... Just show me where the declaration says that, where the parties intended in the termination agreement to have 50-50 sharing from 1994 on. It's in the Joint Appendix. On pages A1, 2, 1, 2, 0, 5, and 0, 6. 2, 1, 2, 0, 5, and 0, 6. It's the declaration of Mr. Vitola and also on A2, 1, 1, 3, 5. Well, just show me where he says that they agreed that from 1994 onward it would be 50-50. Starting on paragraph 15 on the bottom of page A1, 2, 1, 5. The third dispute regarding the FDIC's sharing percentage of the tax benefits was resolved in the termination agreement with the FDIC obtaining 50% of the tax benefits after 1994. And 1994 is then described as the transition year, which we went into in our brief work. There was some dispute about that, and it was a 43.75% agreement. Yeah, but I understand it to be saying there that the language corrected it, whereas what you're arguing is that it should be reformed because the language didn't correct it. Oh, no, I misunderstood Your Honor's question, and it's clearly what Mr. Vitola is talking about here is that, in his view, the termination agreement accomplished what we're arguing. Okay, so who testified that the termination agreement didn't accomplish it, but that the parties intended to accomplish it? Well, no, I don't think there's anything that says that dichotomy. What our argument is saying is that it did intend it, that the parties did intend it, and they did accomplish it. Your Honor is correct that nobody submitted a declaration that this was not the result of the termination agreement. That simply came up in the litigation. Everybody on both sides has testified that they thought this was what the goal was and the accomplishment was. I'm out of time unless the Court has any questions. Again, I want to reiterate my argument that we didn't go into much detail with it. Thank you, Mr. Ross. Thank you.